SOUTHERN BURLINGTON COUNTY N.A.A.C.P.; CAMDEN
COUNTY C.O.R.E.; CAMDEN COUNTY N.A.A.C.P.; ETHEL
LAWRENCE; THOMASINE LAWRENCE; CATHERINE
STILL; MARY E. SMITH; SHIRLEY MORRIS; JACQUE-
LINE CURTIS; GLADYS CLARK; BETTY WEAL AND
ANGEL PEREZ ON BEHALF OF THEMSELVES AND
ALL OTHERS SIMILARLY SITUATED, PLAINTIFFS,
AND DAVIS ENTERPRISES, PLAINTIFF-INTERVENOR,
v. TOWNSHIP OF MOUNT LAUREL ET AL., DEFEND-
ANTS.

Superior Court of New Jersey
Law Division

Decided July 7, 1978.

318

320

[redacted]

Mr. *Stanley C. Van Ness,* Public Advocate, attorney for plaintiffs (Mr. *Carl S. Bisgaier,* argued the cause, Mr. *Kenneth E. Meiser, Ms. Linda R. Hurd* and Mr. *Peter J. O'Connor,* on the brief).

Messrs. *Brandt, Haughey, Penberthy & Lewis,* attorneys for plaintiff-intervenor (Mr. *S. David Brandt* appearing).

Messrs. *Trimble & Master* and Messrs. *Gaccione and Pomaco* attorneys for defendants (Mr. *John W. Trimble* and Mr. *John E. Patton* appearing).

WOOD, J. S. C. This action in lieu of prerogative writs is before the court on amended complaint filed by plaintiffs Southern Burlington County N. A. A. C. P. and certain individuals, alleging failure by defendant Township of Mount Laurel to comply with an order of this court as modified by the Supreme Court, whose opinion is reported *sub nom. Southern Burlington Cty. NAACP v. Mount Laurel Tp.,* 67 *N. J.* 151 (1976), which declared portions of the zoning ordinance of the township to be invalid and directed that they be amended in a manner so as to safeguard the civil rights of the plaintiff. In the present action Davis Enterprises has intervened as plaintiff by leave of the court upon grounds and for reasons hereinafter stated.

The original complaint alleged that the zoning ordinance was so designed so systematically to exclude from the township the development of residential housing such as would be available to persons of low and moderate incomes. Plaintiffs contended that the effect was that numbers of persons, including the individual plaintiffs, were forced to live in housing which was seriously substandard, in a state of advanced deterioration and without even the most basic and elemental municipal services, particularly water and sewer, and that others of low or moderate income were denied the opportunity to live in the township.

A trial was held before Judge Martino, whose opinion is reported as *Southern Burlington Cty. NAACP v. Mount Laurel Tp.*, 119 *N. J. Super.* 164 (Law Div. 1972). Judge Martino found that the intent as well as the design and effect of the ordinance were to control affirmatively the residential development of the township so as to attract what he called a "selective type of growth". The restrictions imposed thereby were found to be so onerous as to drive the minimum cost of a house, completely bare and built by nonunion labor, to a level which would not qualify for federally subsidized programs within the reach of the individual plaintiffs. Mobile homes were excluded entirely. All types of multi-family housing were also excluded, except on farms under limited conditions.

The proofs further demonstrated that township officials, in public statements, freely acknowledged a purpose to limit or exclude low or moderate-income housing.

Judge Martino stated his conclusion as follows:

The patterns and practice clearly indicate that the defendant municipality through its zoning ordinance has exhibited economic discrimination in that the poor have been deprived of adequate housing, and the opportunity to secure the construction of subsidized housing and has used federal, state, county and local finances and resources solely for the betterment of middle and upper-income persons. The zoning ordinance, is, therefore, declared invalid.

He thereupon ordered that the township, upon the entry of judgment, immediately undertake a study to identify:

a. The existing sub-standard dwelling units in the township and the number of individuals and families, by income and size, who would be displaced by an effective code-enforcement program;
b. The housing needs for persons of low and moderate income:
1. Residing in the township;
2. Presently employed by the municipality or in commercial and industrial uses in the township;
3. Expected or projected to be employed by the municipality or in commercial and industrial uses, the development of which can reasonably be anticipated in the township.

Defendant township was directed, upon the completion of such investigation, to establish, to the extent possible, an estimated number of both low and moderate-income units which should be constructed in the township each year to provide for the needs as identified in the quoted paragraph. Defendant was further directed, upon completion of such analysis to

* * * develop a plan of implementation, that is, an affirmative program, to enable and encourage the satisfaction of the needs as previously set forth. That plan shall include an analysis of the ways in which the township can act affirmatively to enable and encouraage the satisfaction of the indicated needs and shall include a plan of action which the township has chosen for the purpose of implementing this program. The adopted plan shall encompass the most effective and thorough means by which municipal action can be utilized to accomplish the goals set forth above. [119 N. J. Super. at 179]

The township was directed to explain in detail any circumstances which it might find to exist which would tend to bar implementation of such plan. Time limits were set for required compliance with the court's order. That portion of the judgment declaring the ordinance invalid was suspended until the township should have sufficient time to enable it to "enact new and proper regulations for the municipality".

Appeal by defendant township and cross-appeals by certain of the plaintiffs were certified by the Supreme Court on its own motion before argument in the Appellate Division.

The Supreme Court generally affirmed the findings and conclusions of the trial court, which it summed up thus:

The record thoroughly substantiates the findings of the trial court that over the years Mount Laurel "has acted affirmatively to control development and to attract a selective type of growth" (119 *N. J. Super.* at 168) and that "through its zoning ordinance has exhibited economic discrimination in that the poor have been deprived of adequate housing and the opportunity to secure the construction of subsidized housing, and has used federal, state, county and local finances and resources solely for the benefit of middle and upper-income persons. [67 *N. J.* at 170]

The court accepted the representation of the township that the regulatory scheme of the zoning ordinance was not adopted with any desire or intent to exclude prospective residents on the obviously illegal basis of race, origin or believed social incompatibility. Nevertheless, it accepted the view that the effect of Mount Laurel's land use regulation has been to prevent various categories of persons from living in the township because of the limited extent of their income and resources. 67 *N. J.* at 159. It stated the duty of Mount Laurel (and developing municipalities generally) as follows:

We conclude that every such municipality must by its land use regulations presumptively make realistically possible an appropriate variety and choice of housing. More specifically, presumptively it cannot foreclose the opportunity of the classes of people mentioned for low and moderate income housing and in its regulations must affirmatively afford that opportunity, at least to the extent of a municipality's fair share of the present and prospective regional need therefor. These obligations must be met unless the particular municipality can sustain the heavy burden of demonstrating peculiar circumstances which dictate that it should not be required so to do. We reach this conclusion under state law and so do not find it necessary to consider federal constitutional grounds urged by plaintiffs. [at 174]

The court found the Mount Laurel zoning ordinance to be unconstitutional in a number of respects:

1. It permitted basically only one type of housing — single-family detached dwellings, thus excluding all other

types, *e. g.*, all multi-family and apartment-type dwellings, town (row) houses, and mobile home parks.

2. Such apartment-type housing as was permitted in Planned Unit Developments (PUD's) was so circumscribed by restrictions as to size, number of bedrooms, etc., as to insure that such housing should be available only to the relatively affluent and of no benefit to low and moderate income families.

3. The ordinance was so restrictive in minimum lot area, lot frontage and building size requirements as to preclude single-family housing for even moderate-income families.

The court opined that the ordinance was "presumptively contrary to the general welfare and outside the intended scope of the zoning power in the particulars mentioned," and that "a facial showing of invalidity" has been established, "shifting to the municipality the burden of establishing valid superseding reasons for its action and non-action."

Rejecting the reasons advanced by the township (chiefly based on economic, tax and environmental considerations) the court concluded:

By way of summary what we have said comes down to this. As a developing municipality Mount Laurel must, by its Land Use Regulations, make realistically possible the opportunity for an appropriate variety and choice of housing for all categories of people who may desire to live there, of course including those of low and moderate income. It must permit multi-family housing, without bedroom or similar restrictions, as well as small dwellings on very small lots, low cost housing of other types, and, in general, high density zoning without artificial and unjustifiable minimum requirements as to lot size, building size and the like, to meet the full panoply of these needs. [at 187]

The court added that the obligation to afford the opportunity for decent and adequate low and moderate-income housing extends at least to the municipality's present and prospective need therefor. It suggested that in the task of determining this township's fair share of a regional need resort may be had to the expertise of the municipal planning

advisor, the county planning board and the state planning agency. Thus, it suggested, "a reasonable figure for Mount Laurel can be determined, which can then be translated to the allocation therefor on the zoning map." 67 *N. J.* at 190. It added the thought that the type of information called for in Judge Martino's original order concerning the needs of persons of low and moderate income now or formerly residing in the township in substandard dwellings, and those presently employed or reasonably expected to be employed therein, will be pertinent.

Finally, the court concluded that the judgment of the trial court invalidating the zoning ordinance *in toto* was too broad. It declared it to be invalid only to the extent and in the particulars set forth in the opinion. The township was granted 90 days from the date of the mandate or such additional time as the trial court might allow to adopt amendments to correct the various deficiencies specified. It is, said the court, "the local function and responsibility, in the first instance at least, * * * to decide on the details of the same within the guidelines we have laid down. If plaintiffs desire to attack such amendments they may do so by supplemental complaint filed in this cause within 30 days of the final adoption of the amendments." 67 *N. J.* at 191.

As a sort of clarifying postlude, the court added:

The municipality should first have full opportunity to itself act without judicial supervision. We trust it will do so in the spirit we have suggested, both by appropriate zoning ordinance amendments and whatever additional action encouraging the fulfillment of its fair share of the regional need for low and moderate income housing may be indicated as necessary and advisable. (We have in mind that there is at least a moral obligation in a municipality to establish a local housing agency pursuant to state law to provide housing for its resident poor now living in dilapidated, unhealthy quarters). The portion of the trial court's judgment ordering the preparation and submission of the aforesaid study and report and plan to it for further action is vacated as at least premature. * * * Should Mount Laurel not perform as we expect, further judicial action may be sought by supplemental pleading in this cause." [at 192]

The township sought *certiorari* in the Supreme Court of the United States which was denied.

Immediately following the New Jersey Supreme Court's opinion the township commenced gathering information through its land planner, Louis Glass, for the purpose of studying the problems of exclusionary zoning and fair share plans. Under the direction of Judge Martino defendants were to make 90-day progress reports to the court. Ultimately, the planning board approved a series of amendments to the zoning ordinance which were enacted in May 1976 as Ordinance 1976–5.

Pursuant to the leave given by the Supreme Court plaintiffs thereafter filed the present action challenging the amendments and expanding the original allegations of the complaint to include an attack on the ordinance for failure to provide mobile home parks and failure to include such an alternate type of housing in the amendatory ordinance.

In this action Davis Enterprises intervenes as an additional plaintiff, by leave of the court, to litigate "all issues which the intervenor has in common with the litigants in this case". The complaint filed by Davis joins the other plaintiffs in alleging noncompliance by Mount Laurel with the decision of the Supreme Court.

Davis is a landowner and developer who seeks to develop and construct a mobile home community which would provide housing to persons of low and moderate income. The tract upon which he proposes to erect this development contains approximately 107 acres situate at the intersection of Mount Laurel Road and Elbow Lane Road — an area presently zoned R–3. His repeated applications and requests for approval of such development and for zoning changes to permit the same have been uniformly rejected by the township. He here seeks judgment declaring provisions of the zoning ordinance having the effect of prohibiting the use and development of mobile homes and mobile home parks anywhere within the township to be illegal and invalid, and further seeks judgment

affirmatively directing the township to permit the development by him of a mobile home park on the tract in question.

The case was tried on the central contention of all plaintiffs that Mount Laurel has failed to comply with the direction of the Supreme Court that it adopt amendments to correct the deficiencies specified in the court's opinion.

Mount Laurel contends that the adoption of Ordinance 1976–5 constitutes compliance with these directives and that, by its adoption, the township has taken the steps required of it to make realistically possible, by its land use regulations, an appropriate variety and choice of housing, and that the effect of the amendments is to afford to the extent of its fair share the opportunity for people of low and moderate income to obtain housing within the township.

Plaintiffs, on the other hand, assert that Ordinance 1976–5 is ineffective to constitute compliance with the directive of the Supreme Court. Further, they seek not only the invalidation of Ordinance 1976–5 but also an order for greatly expanded remedies. What they now demand is judgment requiring township to take "affirmative action" to afford low and moderate-income housing within the municipality in accordance with what they contend is the municipality's fair share.

## I. *The Amending Ordinance*

We proceed to examine the amendatory ordinance proffered by the township as establishing compliance.

Ordinance 1976–5 was passed and adopted on April 19, 1976. It is entitled "An Ordinance of the Township of Mount Laurel — Amending and Supplementing an Ordinance known as the Mount Laurel Zoning Ordinance of 1964 and Providing for the Establishment of R–5, R–6 and R–7 Districts To Comply with the Order of the New Jersey Supreme Court dated March 24, 1975."

The three new zoning classifications established are designated as follows:

R–5—Townhouse-Garden Apartment District

R–6—Single Family District

R–7—Multi-Family District

Garden Apartments and Townhouses are defined as follows:

[Garden Apartments] — A group of multi-family dwellings, architecturally designed with one unit placed on top of another unit up to three units in height, designed for rental or sale of the individual units, having common open spaces, and designed in accordance with the requirements for such dwellings as set forth in this ordinance.

[Townhouses] — A building that has not less than three or more than eight one-family adjacent dwelling units erected in a row as a single building, each being separated from the adjoining unit or units by an approved masonry party or partition wall or walls, thus creating distinct units intended for separate ownership or rental. This definition shall also include such terms as "row house", "patio house", "court dwelling", "maisonette", etc.

The ordinance preliminarily declares as its objective: "* * * to comply with the new Supreme Court's order of March 24, 1975, regarding zoning in the township." It recites that the township "has undertaken a study to determine the present housing need for families currently living in Mount Laurel, based on income levels and condition of housing." The base year of 1970 is selected "for statistical consistency, in order to utilize the information available from the U. S. census."

Certain factual determinations or assertions resulting from the study are set forth as follows:

By a "door-to-door field survey" there are found to be 36 existing occupied substandard houses.

It is found that there are 67 "financially deficient" families (defined as resident families and unrelated individuals with incomes up to $10,000).

The recited study ascertained the number of existing housing units in 1970 valued up to $20,000, or renting for no more than $199 a month, and found the "excess number of low income families over available housing units."

The "present need" is thereupon stated to have been "set at 36 substandard units and 67 financially deficient families for a total of 103 units."

A calculation is made based upon a determination "by detailed engineering study" of the availability of developable land in the township, the availability of such land in Burlington County, the ratio of developable land in the township to developable land in the county, and the total number of future units to be "allocated to Burlington County with household incomes up to $10,000" to the year 2000. Mount Laurel's fair share to the year 2000 is set at 515 units.

There follows a "housing timetable," projecting development or building of housing units for the "first five years," setting forth the present need for 103 units, and projecting thereafter the building of 17 units per year for the "first five years." A five-year review is provided to determine whether modifications in this timetable are necessary. To be considered in this quinquennial review are the rate of housing development in the township, the size of lots developed, population and housing data presented in the next U. S. census, employment and commercial development, and "all other pertinent criteria."

The ordinance proceeds to provide detailed "design standards" and density regulations for the housing permitted in the newly created districts. In the R–5 (Townhouse-Garden Apartment) zone there is permitted a maximum of ten units per acre and there is a required allocation of not less than 2,000 square feet of lot area per bedroom. In the R–6 (Single-family) zone the minimum lot size is 6000 square feet with a prescribed average lot frontage of 50 feet. Lots with frontage of "more or less" than 50 feet are permitted, provided that the average frontage for all lots shall not be less than 50 feet.

With respect to the newly created R–7 zone the ordinance recites the previous approval of four planned unit development (PUD) projects and the court's criticism by its pres-

ent decision that the regulations pertaining to them "sharply limit the number of apartments having more than one bedroom." The ordinance, "in order to remedy this situation and to comply with the court's order," creates the R–7 zone "by removing certain conditions in multi-family sections of planned unit development districts where such R–7 zone shall be applicable." It further provides that "at the option of the developer, the applicable multi-family sections shall be exempt from specific conditions of approval specified in Exhibit D." (This exhibit is a list of certain elaborate conditions otherwise applicable to all planned unit developments.)

The ordinance adds a series of "control provisions," setting out procedures and conditions for the obtaining of approval of development in the newly created districts. These provisions include the requirements that the applicant make and furnish a traffic impact study, economic cost benefit study, a study of municipal services to indicate the extent of existing services and the need for additional services to meet the needs of the project, an environmental impact statement to be prepared in accordance with guidelines and practices of the New Jersey Department of Environmental Protection, and a study of the impact of the projects on the "Housing Timetable." Such statement must "indicate the number of qualified units proposed, the price or rental ranges, and how the applicant intends to make the units available to qualified families."

Other regulations include provisions for performance bonds, maintenance guarantees and the imposition of penalties for deviations or violations.

The designated districts are as follows:

R–5 is located on the township line between Moorestown and Mount Laurel, bounded on the northeast by Pennsauken Creek and containing 13 acres, more or less.

R–6 is located on the west side of Hartford Road 823 feet from its intersection with the southeasterly side of the Hainesport-Mount Laurel Road; and contains 7.45 acres.

R-7 is defined as "10% of all units to be constructed in the Larchmont PUD in Larchmont Center Section 7." These, it provides, may be constructed subject to the provisions of § 1707 *et seq.* of the ordinance. In other words it would appear that R-7 is in effect what was referred to in the testimony as "a floating zone." The designation of the districts is set forth in Exhibit A annexed to the ordinance.

Exhibit B annexed to the ordinance contains and sets forth a number of studies and reports used to establish the standards and criteria which are described in the amending ordinance.

Exhibit C sets forth a calculation of present housing needs for 1970 for low and moderate-income residents.

Exhibit D sets forth a list of planned unit development conditions to be waived. These include conditions which were stated to have been criticized by the Supreme Court as being unduly cost-generating and thus having the effect of being exclusionary in nature.

## II. *Plaintiffs' Criticism of the Ordinance*

Plaintiffs' attack on the sufficiency of the amending ordinance as a response to and compliance with the Supreme Court directions was mounted principally by three expert witnesses: Allan Mallach, a housing developer and specialist in urban planning and demographic research, and professor of administration and urban studies at Stockton State College; Mary E. Brooks, Director of Research and Planning for the Suburban Action Institute, a nonprofit corporation for "expansion of housing opportunities," and Peter Abeles, a planning and development expert of considerable experience and head of a sizeable organization engaged in research in this field.

Mallach attacked the ordinance as "faulty in method and definitions." His opinion was that the estimate embodied therein of Mount Laurel's "fair share" of regional needs for low and moderate-income housing is grossly inadequate.

He charged that it does not adequately consider the capacity of the township to make available an adequate amount of land properly to meet its fair share. For example, he criticized the exclusion from the calculation of land available for housing, lands referred to in the ordinance as "legally committed land," and also land said to be within a flood plain area. These lands, according to Mallach, cannot be ignored in development of plans to meet the township's fair share allocation of low and moderate-income housing. Further, Mallach contended that the ordinance is faulty in not considering other factors in arriving at a fair share determination. Compared with calculations of the township's share of regional housing needs made by others, including Mallach himself, he found the calculations of such need inadequate and the scheme of the ordinance not truly designed to meet such need or to comply with the directives laid down by the court.

Mallach compared the ordinance plan with studies by the Delaware Valley Regional Planning Commission, showing a need for 22,835 new housing units in Burlington County between 1977 and the year 2,000. His own "fair share housing" allocation for Mount Laurel Township projects 3,672 dwelling units to be built in that period.

Mallach further opined that, in determining the need for "fair share" or low and moderate-income housing, there must be considered not only the income of those in need of housing but also such income in relation to housing costs —a relationship which, he said, has been "deteriorating" in recent years as costs generally, and particularly housing costs, have escalated.

Ms. Brooks discussed in general terms the nature and purpose of "fair share plans" which, she said, have two essential goals: to expand the *supply* of housing, and to enlarge the available *choice* of housing for persons and families of low and moderate income. The purpose of allocation of the obligation to accept or permit low and moderate-income housing is, among other things, to expand the

geographical choice of housing available to such persons and families. She suggested that, between the present and the year 2,000, 42.5% of all housing permitted or built in Mount Laurel Township should be "low and moderate income" housing.

She undertook to compare the fair share plans proposed by the County of Burlington, the New Jersey Department of Community Affairs and Mallach. The first two she pronounced of doubtful acceptability. The Mallach plan, she said, "tends to conform" to the standards set forth by the Supreme Court.

As to the plan proposed by Louis Glass and embodied in Ordinance 1976–5, she dismissed it as "not a fair share plan" and "not acceptable" since, she contended, it does not conform to the standards set by the court.

Both Mallach and Brooks suggested that any municipality (e. g., Mount Laurel) having a present low proportion of low and moderate-income housing should be obliged to "compensate for past exclusionary practices," presumably by the admitting of a greater share or proportion of housing for low and moderate-income persons and families.

Abeles' criticism of Ordinance 1976–5 was extensive and detailed. In the first place, he pointed out that the ordinance only rezones 20 acres out of a total township area of 22.4 square miles (14,300 acres) to meet, as the ordinance avows, the requirements imposed by the Supreme Court. This is less than one fourth of one per cent of the total township area.

Besides their inadequate size, Abeles maintained that the new zones created by the ordinance are themselves encumbered with such onerous physical difficulties and restrictions created by the ordinance as to render their actual development for low-cost housing a virtual impossibility. Some of the more important shortcomings specified by Abeles are as follows:

1. The tracts of land designated for all three of the new zones, besides being too small in size, are each owned by a single owner. Thus, if the owner of any of these sites does not choose to develop it for the housing specified in the

ordinance, there is no opportunity for anyone else to do so, and the opportunity for low-cost housing ostensibly intended by the creation of the zone is at once a nullity.

2. The tract zoned R–5 is a 13-acre tract set in close juxtaposition to and in effect carved out of the industrial district. It is isolated from other residential zones. Its topography is such as to render any building upon it difficult. It is low-lying and swampy, and presently covered with rank, dense underbrush. Pennsauken Creek runs through a portion of it and there is a possibility of flooding problems. There is presently no access to the tract by any public road. Abeles contended that the only feasible access that could be afforded is by the extension of Nixon Drive, a privately owned stretch of road serving a large shopping mall and lying principally in Moorestown Township. Present engineering plans for the extension of a high-speed commuter rail line into Mount Laurel Township contemplate the use by the rail line of a part of this already small tract. Abeles maintained that after subtracting from the total area of the tract the portions unusable because of the creek, the flood plain and the contemplated rail line, there are left 1.25 acres for actual use for housing. Under even minimum standards this would accommodate no more than 60 housing units with preservation of a marginally acceptable living environment. He added that it is likely that it would be afflicted with unacceptably high noise levels, both from the motor traffic that would be certain to flow in and about it, and from the rail line if and when it is built. Abeles contended that all these and other incidental considerations combine to make the area designated R–5 practically useless for residential housing.

3. As to the site zoned R–6 (single-family dwelling), again Abeles testified, its small size and geographic location both militate against its practical suitability as a zone district affording realistic opportunity for low and moderate-income or least-cost housing. Like the R–5 zone, the tract zoned R–6 is itself low-lying and swampy, posing serious

difficulties for housing development. The tract is a considerable distance from public utilities, particularly water and sewer — a factor which, of course, automatically adds to the prospective cost of development. In addition to these cost-raising factors the land use controls imposed by the ordinance are themselves, in Abeles' opinion, onerous and cost-generating. There is no provision for use of mobile homes. While the permitted lot size of 6000 square feet is appropriate and would serve to satisfy the Supreme Court requirement that single-family dwellings be permitted on "very small lots," the land-use controls and regulations respecting such incidentals as size and number of parking spaces, width of streets, sidewalks, etc., he argued, are not really necessary and tend merely to add unduly to the costs of development and hence to militate against the development of least-cost or low and moderate income housing.

4. As to the R-7 zone which is designated as 10% of the housing permitted to be built in a designated section of a planned unit development, the ordinance contains a series of provisions waiving certain PUD development conditions, some of which, at least, would themselves appear to be unconstitutional. Particularly to be noted is a restriction (purportedly waived by 1976–5) barring children from being among the occupants of one-bedroom apartments and severely limiting the number of children permitted in other more spacious quarters. Abeles' opinion was that such restrictions have no proper place in a zoning ordinance in the first place. The provision waiving them thus appears to be devoid of significance. Abeles opined that the waiver of all the specified conditions would not be a sufficient inducement to developers to try to develop housing at the lowest possible cost without Federal assistance.

5. Abeles directed some of his sharpest criticism toward the "general control" provisions of the ordinance, limiting the number of housing units which may be built under the provisions of the ordinance in any one year, and further, limiting applicants by certain priorities. Those with actual

government subsidies are given top priority and private developers are at the bottom of the list. As a practical matter, the designation of the sites provided in this ordinance only affords development opportunity to three specific developers. Unless these developers elect to abide by the multiple regulations set forth therein, there will be no assisted or subsidized housing because no one but the three developers who own the selected sites can even attempt to get development approval.

Finally, the ordinance provides for a series of five studies which prospective developers are required to furnish as follows: Traffic Impact Study; Economic Cost-Benefit Study; Municipal Services Study; Environmental Impact Statement, and a study of Impact on Fair-Share Allocation. In view of the care evidently used by the drafters of the ordinance in site selection, these studies, in Abeles' opinion are superfluous and unnecessary besides being severely costly and time-consuming. Moreover, it is noted, no such studies are required to be furnished by any developer anywhere else in the township.

In summary, Abeles' opinion is that the provisions of Ordinance 1976-5 in their totality, far from encouraging and making reasonably possible a fair share of low and moderate-income housing, have just the opposite effect. They constitute a deterrent for the development of the designated sites for either subsidized or least-cost housing.

Plaintiffs' final witness was Yale Rabin, Professor of Urban Planning at the University of Virginia, and engaged in private practice concerned with "promoting housing opportunities for low and moderate income families or groups." Rabin attempted to describe and evaluate the changes which had occurred in Mount Laurel since the first trial in this case in 1972. He utilized data and information furnished him from a number of sources respecting the earlier condition of the township, including records furnished him by the township building inspector, school data relating to geographical distribution of children, relocation records supplied

by the Burlington County Community Action Program, and information furnished by Everett Johnson, the Superintendent of Public Works, as to road improvements between 1970 and 1976. He testified that he compared and evaluated this data in the light of a personal inspection made by him prior to this trial.

Rabin found "substantial changes" to have taken place in the township since the first trial. Specifically, he noted growth in development for residential, industrial and office use, and expansion of support facilities, such as the building of additional roads in residential areas. However, he testified that he found "no improvement" in areas of residences of low and moderate-income persons. The areas, were, he said, smaller in size, but were otherwise substantially unchanged. Housing conditions for the poor, he said, were not improved, and "no units of low income housing" were provided.

In matters of road improvement, recreation, fire protection, zoning and code enforcement, Rabin found that substantial attention was paid to areas of "affluent development" but almost none to poorer areas such as that known as Springville and the neighborhood of Texas Avenue. In these latter areas streets were either unpaved or only roughly paved. Some streets serving relatively little development, he testified, were poorly paved, while others serving more people and subject to much heavier use were not improved at all. Rabin also noted improvement in street lighting in many residential areas, but not in the poorer areas mentioned.

Rabin's conclusion was that the needs of low and moderate income residents have been and continue to be substantially ignored by the township.

## II. The Township's Response

The township countered the testimony of plaintiffs' witnesses with testimony from others which was equally extensive and detailed.

Louis Glass, township planner and the person largely responsible for drafting Ordinance 1976–5, testified at length. With the aid of numerous exhibits, he described the general pattern of development in the township. Development has tended to be concentrated along and near the border of the municipality and in proximity to the main arteries of the state and interstate highway network. The center of the township continues, as in the past, to be devoted principally to agricultural use and to remain relatively sparsely populated. This central section of the township has a generally high water table, a fact which makes the land difficult and expensive to develop for residential use, or, indeed, for any use other than farming, due to the fact that the soil is generally "severe" (i. e., inhospitable) for the accommodation of septic systems.

It should also be mentioned that preservation for agricultural use of lands actively devoted to such use is in accordance with state policy.

Glass described and defended the three new zones created by Ordinance 1976–5 as part of a bona fide effort to provide the opportunity for low and moderate-income housing. In answer to some of the principal criticisms leveled at the ordinance by plaintiffs he dealt at some length with various aspects thereof.

His explanation of the reasons for the selection of the sites designated for the new zones is worthy of review.

As to the R–5 (Townhouse-Garden Apartment) zone, plaintiff's principal criticisms of the site were among the factors which led the planner to select it. Its proximity to the industrial zone, far from being a drawback, contributes to ease of access to employment opportunities which will be generated with development of that zone. The proximity of the proposed high-speed rail line extension is another asset rather than a liability since it will afford easy low-cost transportation between the township, and particularly this area, to the City of Philadelphia. The site is also within a short distance of excellent shopping facilities and recreation

areas in both Mount Laurel and the neighboring Township of Moorestown. The site is, moreover, convenient to and in close proximity to a network of state, county and local roads, giving ease and convenience of access. Existing water and sewer facilities are already in place within a few hundred feet and can readily be extended to the district.

Other criticisms of the R-5 site were that it is located partly in a flood plain and that there is a proposal to locate a water retention basin (which might be necessary because of the low level of the land) within the area. The location of part of the area in a flood plain would not prevent the use for building of that part which is not, and the remainder could be used for open space. *Cf.* Bisgaier, "Some Notes on Implementing Mount Laurel — An Admittedly Biased View." *N. J. L. J.*, August 19, 1976. Further, it was pointed out that location of such a retention basin within the new R-5 district is not a *fait accompli* and is subject to change. This is also true of the proposed location of the high-speed line, which is not in immediate contemplation and whose route could easily be changed.

The R-6 (single-family dwelling) zone is created for the specific purpose of meeting the Supreme Court requirement that there be made available the opportunity to develop "small dwellings on very small lots," along with "low cost housing of other types, and, in general, high density zoning without artificial and unjustifiable requirements as to lot size, building size and the like." *Mt. Laurel, supra,* 67 *N. J.* at 187. The site is, as Glass acknowledged, located quite close to the area known as Springville, which is presently inhabited largely by residents of low or moderate-income and is sometimes referred to as a "pocket of poverty." This fact was criticized by some of plaintiffs' witnesses, apparently on the theory that there might thereby be encouraged the creation of an area akin to a ghetto. However, it was admitted that the population of the Springville area is of extremely low density. It is difficult to discern any real merit in this criticism of R-6. Moreover, the site was chosen, as

was R-5, partly because of its advantageous location within only a short distance of the proposed southerly extension of water and sewer lines for the Larchmont PUD, thus potentially making these services available to the new district without excessive cost.

As for the R-7 district, its location is really not a matter of controversy because it already constitutes a geographical part of the Larchmont PUD, and has been approved as such.

Glass testified that, having regard to land actually developed and land legally committed to development by virtue of approvals of planned unit developments, the township is 45% developed and 54% undeveloped. He disputed testimony of plaintiffs' witness that an excessive amount of land is zoned industrial. The area so zoned is not 4,000 acres but 2,300 acres.

Glass testified that the total vacant "raw" land actually available for development in the township is 4,238 acres.

Glass reinforced his contention that the Mount Laurel zoning ordinance, as amended by Ordinance 1976-5, does comply with the directive of the Supreme Court, by reference to the planned unit developments already approved and in which housing is already in the process of construction. He testified that, for least-cost fair share purposes, Mount Laurel has, by its zoning ordinance as amended, provided for 10,672 units for the present and the immediate and reasonably foreseeable future, broken down as follows:

1. 1,772 PUD units already constructed and occupied at the time of trial.

2. 8,797 additional PUD units whose construction is anticipated to proceed and be completed well before the year 2,000.

3. 103 units, construction of which is immediately possible by virtue of the creation of the new R-5, R-6 and R-7 zones.

The PUDs, Glass pointed out, comprehend and make possible the "variety and choice of housing" contemplated by

the Supreme Court. For example, the Larchmont PUD has been approved for 6,054 units, 14% of which are single-family dwellings, the entire remainder consisting of multi-family housing of various types and sizes.

In terms of cost, the price of these new units would seem to compare favorably with housing costs and prices generally in today's inflated market. For example, Glass testified that in the Larchmont PUD the price of three-bedroom townhouses was between $36,490 and $38,490, with some four-bedroom units selling for $37,490. In the Birchfield PUD, one-bedroom townhouse units were priced at $27,000; two-bedroom units at $33,000, and three-bedroom units at $36,500.

Rental costs appear to be comparable. Rental for a one-bedroom apartment in Larchmont was said to be $240 a month and for a one-bedroom/den apartment $265 a month. In Ramblewood Village there were stated to be 54 one-bedroom apartments renting for $265 a month and 18 two-bedroom apartments renting for $310 a month.

Glass contended, based on this evidence, that PUDs are a practical and workable means of helping to meet the general need and demand for low and moderate-income, or least-cost housing. He testified that 90% of housing activity in the township is in the PUDs, and most of the housing being built therein may be said to be least-cost housing. Six planned unit developments have been approved and are in the process of development. They are known, respectively, as Larchmont, Birchfield, Ramblewood, Cross-Keys and a Planned Adult Retirement Community. All of these follow the general pattern of following the perimeter of the township where the land is most suitable for the accommodation of housing development.

Quite aside from the present cost of such housing units in their newly-constructed state, the testimony of the experts makes it clear that, with the normal passage of time and the impact of age and wear and tear, many of such units will, through what has been called a "filtering-down"

process, predictably qualify as low and moderate-income housing, if indeed they do not so qualify already. It was contended by Glass, and is strenuously urged by the township, that in the making of housing reasonably available to persons of low and moderate income, the "filtering down" of existing housing must necessarily be considered. The construction and occupancy of new housing may reasonably be supposed to create vacancies in and increase the availability of existing housing, thus adding to the total stock of available housing.

## IV. *Has the Township Met the Court's Test?*

The ultimate question to be decided in this suit is whether Mount Laurel has, by the changes it has wrought in its zoning ordinance, done that which is necessary to comply with the Supreme Court mandate — that the township, by its land use regulations, make realistically possible the opportunity for an appropriate variety and choice of housing for all categories of people who desire to live there, including those of moderate and low income.

At the outset of the discussion which follows it is worthy of note that the court stated the duty of the township to be to make a variety of housing realistically possible *by its land use regulations*. This would seem, at a glance, to refer not only to zoning ordinances but also to other phases of land use regulation, including planning codes, building codes, subdivision ordinances and building codes. However, what the court had before it in this case was a consideration only of zoning ordinance and it was the exclusionary aspects of this which the court specifically found unconstitutional and which it directed be corrected by municipal action.

The attack mounted in this case attempts to go beyond consideration of the zoning ordinance and to attack the other ordinances relating to land use regulations as well. For reasons which follow I consider this attack too broad, and shall limit consideration of this case to the question

whether Mount Laurel has, by its zoning ordinance as amended, taken sufficient and proper action to comply with the court's directive.

### A. *The Determination of a Fair Share.*

The township's determination of its own fair share of the regional need for low and moderate-income housing has been set forth above. The determination is attacked by plaintiffs' witnesses, particularly Mallach and Brooks, as being insufficient and inadequate in its determination of the municipality's "fair share."

The difficulties inherent in any attempt to determine a "fair share" of "regional" housing needs were quickly recognized by the Supreme Court in *Oakwood at Madison Inc. v. Madison Tp.,* 72 *N. J.* 481 (1977). The court, speaking of fair share determinations, said:

Fair share allocation studies submitted in evidence may be given such weight as they appear to merit . . . But the court is not required, in the determination of the matter, itself to adopt fair share housing quotas for the municipality in question or to make findings in reference thereto. [at 543–544]

The court elsewhere in its opinion, spoke of the need, in devising "fair share" plans, to avoid "the 'statistical warfare' which may otherwise result from over-sophisticated formulas." (footnote at 542)

What was engaged in in this trial was just the sort of statistical warfare which the court in *Madison* said should be avoided. This court is unable from the plethora of figures and formulate produced and propounded by the witnesses to make a determination of Mount Laurel's "fair share" of housing needs. As the Supreme Court further said in *Madison*:

The objective of a court before which a zoning ordinance is challenged on Mount Laurel grounds is to determine whether it realistically permits the opportunity to provide a fair and reasonable

share of the region's need for housing for the lower income population. [at 543]

■ Weighing the township's fair share determination as set forth by Glass and embodied in Ordinance 1976–5, against the elaborate formulae advanced by plaintiffs' witnesses, I cannot say that the former is a less accurate determination than the latter. The formulation of a fair share determination is a legislative rather than a judicial function. *Madison* at *p.* 541–542.

■ Plaintiffs' witnesses testified at great length with respect to the present and prospective population growth and the consequential need for additional housing of all types in Mount Laurel. While their expertise must be recognized and their testimony given accordant weight, it nevertheless seems clear that their estimates were no more than informed guesses. Granted that the same is true of the testimony of Glass, I still must note that his opinions were formed in the course of intensive and prolonged study undertaken with the specific objective of advising the governing body of the township in the formulation of legislative amendments which would meet the requirements set forth by the Supreme Court. His testimony in many areas was detailed, forthright and obviously the product of that study. It is entitled to weight at least equal to that of the witnesses for plaintiffs. The closely contested expert testimony in this case is "illustrative of the reasonable differences of opinion in this area." *Pascack Ass'n Ltd. v. Washington Tp. Mayor, etc.,* 74 *N. J.* 470, 488 (1977). I cannot say that the conclusions adopted by Mount Laurel as to its fair share of low and moderate-income housing opportunities are unreasonable simply because others disagree with them. The determination is, as stated, a legislative function. I am convinced that Mount Laurel has sought to exercise that function in good faith and with the express intent of compliance with the requirements of the court.

B. *Other Modifications of the Zoning Ordinance.*

Plaintiffs' attack on and criticism of the amendments embodied in Ordinance 1976-5 are leveled not only at what they do (or are intended to do) with respect to low and moderate-income housing opportunities, but also, and even more vigorously at what it is contended they fail to do. Thus, it is said, many of the faults enumerated by the Supreme Court as tending to render the township zoning ordinance unconstitutionally exclusionary have not been eliminated or "corrected." A few examples will serve to illustrate the thrust of these criticisms.

1. It is stated that the R-1, R-2, R-3 and R-1D (Cluster) zones are unchanged except for the carving out of the new R-6 site, and that the restrictions pertaining to them remain as before. Plaintiffs argue that "zoning for this vast amount of acreage continues to contain the very restrictions criticized by the Supreme Court as realistically allowing only homes within the range of persons of at least middle income."

2. Similar criticism is leveled at the retention virtually intact of the restrictive provisions of the P.U.D. and the P.A.R.C. ordinances.

The duty of Mount Laurel was stated to be to zone to permit (1) multi-family housing without bedroom or similar restrictions; (2) small dwellings on very small lots; (3) low-cost housing of other types; (4) high-density zoning without artificial and unjustifiable minimum requirements as to lot size, building size and the like. How this was to be done was not specified. The carrying out of the duty was expressly left to the municipality.

█ I do not consider it a basis for criticism that many zones remain unchanged. Changes were brought by creation of the new zones. Assuming that some areas are so restrictive (*e. g.,* as to lot size, building size and the like) as to render them hospitable only to large expensive houses beyond the financial reach of low and moderate-income per-

sons, the township is not obliged to force low-cost housing into these existing zones. The very essence of zoning is the creation of areas for different types of activity, so that they will not infringe on each other to their mutual disadvantage. Thus business, industrial, commercial and residential zones are always separated; and within the residential classification, various types of residences, single-family, multi-family, apartments, etc. are likewise separated.

In emphasizing the duty to provide low and moderate-income housing opportunities the court did not negate the propriety of providing for more costly and luxurious housing. The court said:

There is no reason why developing municipalities like Mount Laurel, required by this opinion to afford the opportunity for all types of housing to meet the needs of various categories of people, may not become and remain attractive, viable communities providing good living and adequate services for all their residents in the kind of atmosphere which democracy and free institutions demand. They can have industrial sections, commercial sections and sections for every kind of housing, from low cost and multi-family to lots of more than an acre with very expensive homes. [67 *N. J.* at 190]

The court criticized generally a number of provisions of the P.U.D. and P.A.R.C. ordinances which it characterized as "restrictive" and "cost generating." These criticisms were cited as *factors* supporting the court's conclusion that the Mount Laurel zoning ordinance was, overall, unconstitutionally exclusionary. The court considered that

While multi-family housing in the form of rental garden, medium rise and high rise apartments and town houses is for the first time provided for, as well as single-family detached dwellings for sale, it is not designed to accommodate and is beyond the financial reach of low and moderate income families, especially those with young children. The aim is quite the contrary; as with single family homes in the older conventional subdivisions, only persons of medium and upper income are sought as residents. [at 167]

The court, nevertheless, did not declare invalid the restrictions which it criticized. In a footnote (at 167) it ex-

plained: "We refer to the Mount Laurel PUD projects as *part of the picture of land use regulations* in the township and its effect."

However, I do not understand these directions to mandate a change or modification in the existing PUD ordinance, so long as the zoning ordinance as a whole includes provision for zones wherein such housing is permitted. Plaintiffs assert that Mount Laurel's response to the Supreme Court "order" was "to ignore it." Such an assertion is unwarranted. The creation of the R–5, R–6 and R–7 zones was designed to permit the type of housing which the court said must be permitted.

With specific reference to the R–7 zone, it is created not as a geographic entity but "by removing certain conditions in multi-family sections of existing planned unit development districts where such R–7 zone shall be applicable." Ordinance 1976–5, § 1707.3. Appended to the ordinance as Exhibit D is a list of restrictive and cost-generating requirements to be waived for developers who elect to build parts of PUDs under the R–7 zone provisions.

Plaintiffs assert that R–7 is "merely the designation of one part of one section of one PUD for R–7 development at the option of the developer." This, as pointed out by Glass, is incorrect. The R–7 provision may be invoked by any PUD developer who elects to build thereunder, and the waiver of conditions may be requested by any PUD applicant. Thus, the R–7 zone is in effect a floating zone.

Plaintiffs criticize the provision for exemption of R–7 developers from conditions as "illusory." As to the first three conditions listed in Exhibit D as "waived," I must agree. These have to do with bedroom restrictions and restrictions on the number of school age children. These conditions were declared patently illegal by the Supreme Court. 67 N. J. at 182, 183. Having been declared void they cannot be regarded as part of the zoning ordinance and their "waiver" is a futile act.

348

Nevertheless, the other conditions listed as "removed" do set forth a number of the "cost-generating" requirements criticized by the court. Their removal would seem to have the potential effect of reducing or conserving development costs. The ordinance recites that the R–7 zone is created to remedy the Supreme Court's criticism that "the contractual agreements between municipality and developer sharply limit the number of apartments having more than one bedroom."

Of more serious significance, and having more adverse effect on Ordinance 1976–5 as a compliance with the Supreme Court directive, is the inclusion therein of certain "control provisions" (§ 1708); the requirement for a series of "studies" to be made by any developer of housing in the new zones (§ 1709), and bonding requirements (§ 1710).

The "control provisions" purport to equate the township's fulfillment of its "fair share" obligation with fulfillment of similar obligations by other municipalities in the county. Nowhere does the court declare the township's obligation to be equated to or dependent upon the action of other municipalities. The township may not place such a condition on its obligation. The "control provisions" of § 1708 are declared void *in toto*.

Section 1709 provides for a series of "studies" to be furnished by a developer: a "traffic impact study," an "economic cost-benefit study" and a "study on municipal services." No such studies are required of developers in any of the other zones. That these requirements are onerous, difficult with which to comply, and excessively cost-generating is, to put it mildly, an understatement. The provisions fly directly in the face of the Supreme Court's directive that high-density zoning be provided without artificial and unjustifiable minimum requirements. The requirements are illegally and unconstitutionally discriminatory, are of highly questionable utility, and a violation of the letter and the spirit of the Supreme Court's mandate. They must likewise be declared void.

The ordinance by its terms is severable. The declaring of § 1708, 1709 and 1710 and the other restrictive provisions mentioned to be void does not necessitate similar action with respect to the entire ordinance. Indeed, minus these illegal provisions the ordinance is, in my judgment, better calculated to help provide the housing opportunities mandated by the court.

## C. *The Subdivision Ordinance.*

█ Plaintiffs assert that the township further breached its duty by failing to modify the Mount Laurel subdivision ordinance, which they contend, sets standards for housing which are "greater than" state and federal minimum property standards. The more exacting standards, it is said, tend to increase development costs and so raise the price of housing — therefore, they are exclusionary, I cannot agree that failure to amend the subdivision ordinance is a violation of the court's mandate.

While the court stated in general terms that developing municipalities must "by their land use regulations" make low and moderate-income housing reasonably possible, it did not voice any criticism of the subdivision ordinance as such, nor did it invalidate that ordinance or any part thereof. Only the zoning ordinance was declared invalid, and that only to the extent and in the particulars set forth in the opinion.

█ Much attention, nevertheless, was devoted by plaintiffs' witnesses (Abeles in particular) to standards which they averred are more rigorous than the minimum required for health, safety and welfare. Suffice it to say that I consider this entire line of criticism an exercise in futility. That authorities may differ on such matters as proper street widths, quality of street paving, need for sidewalks, parking regulations, and a host of other details is, of course obvious. Even assuming that such standards in the Mount Laurel subdivision ordinance are indeed "greater" than so-called

"minimum property standards" (MPS), there is no proof that they are set for any purpose other than to serve the public health, safety and welfare, or that they are by any stretch of the imagination exclusionary. Failure to amend the subdivision ordinance to relax such standards was not, as plaintiffs appear to charge, a breach of an undertaking made to the court. No such modification is required. These are matters properly within the sound discretion of the governing body. The exercise of that discretion will only be set aside if it appears arbitrary, capricious or unreasonable. That is not the case here.

### D. "Affirmative Action"

Plaintiffs further charge the township with failure to do its stated duty because, they charge it has "taken no action to *create* an opportunity for federal and state subsidies to be availed of in the municipality." They add that, in fact, the township has "taken an affirmative position against them." The latter charge I reject as completely unfounded and unsupported by the evidence.

The failure to take affirmative action to "make subsidies possible" I likewise cannot consider to be a violation. The court hinted parenthetically at a "moral obligation" on the part of the township to establish a local housing agency to provide housing for its resident poor now living in dilapidated, unhealthy quarters. 67 *N. J.* at 192. However it stated no directive in that regard. Indeed, it must be considered to have declined to so do. The court said:

Courts do not build housing, nor do municipalities. * * * The municipal function is initially to provide the *opportunity through appropriate land use regulations* and we have spelled out what Mount Laurel must do in that regard. [at 192; emphasis supplied]

Plaintiffs also suggest, among other things, that Mount Laurel has a duty to offer prospective builders of subsidized housing the inducement of promised tax abatement or of

agreements for "payment in lieu of taxes" — which is itself a form of tax abatement. I must summarily reject this suggestion, and even more emphatically reject the suggestion that Mount Laurel be compelled by order of this court to offer such inducement. The idea of court-ordered tax abatement was rejected by the Supreme Court in *Madison, supra*. The court there said:

Plaintiffs and supporting amici press for a judicial mandate that developing municipalities be required affirmatively to act for creation of additional lower income housing in more ways than by eliminating zoning restrictions militating against that objective. Of the devices which have been suggested to this end, tax concessions and mandatory sponsorship of or membership in public housing projects must be summarily rejected. Tax concessions would unquestionably require enabling legislation and perhaps constitutional amendment. While we have described the sponsorship of public housing projects as a moral obligation of the municipality in certain specified circumstances, Mount Laurel, 67 *N. J.* at 192, we have no lawful basis for imposing such action as obligatory. It goes without saying, however, that the zoning in every developing municipality must erect no bar or impediment to the creation and administration of public housing projects in appropriate districts.

 \* \* \* \* \* \* \* \*

Various additional suggestions for encouraging the proliferation of lower cost housing on municipal initiative are set forth in the supplemental amicus brief of The Public Advocate but are not deemed to require comment here as none warrant mandatory imposition in any revised *Madison* ordinance. [72 *N. J.* at 546–547]

 For substantially similar reasons I cannot view as a failure to comply with the court's directive the alleged "refusal" of Mount Laurel to engage in other "affirmative action" programs for the encouragement of subsidized housing. The duty of Mount Laurel simply does not extend so far and it is not the right, let alone the inclination of this court, to compel such participation. If participation by Mount Laurel and other municipalities in programs designed to cultivate and foster subsidized housing is to be made mandatory, it must be by the Legislature, whence stems all the authority under which all municipalities exist and function. As the Supreme Court said in *Bow and Arrow*

Manor v. West Orange, 63 N. J. 335, 343 (1973) and iterated in Pascack supra, 74 N. J. at 481:

It is not the function of the court to rewrite or annul a particular zoning scheme duly adopted by a governing body merely because the court would have done it differently or because the preponderance of the weight of expert testimony adduced at a trial is a variance with the local legislative judgment. If the latter is at least debatable it is to be sustained.

### Discrimination in Municipal Services.

Plaintiffs contend that the township has discriminated and continues to discriminate against its "resident poor" in the supplying of municipal services. Testimony of a number of residents was offered concerning the deteriorated and run-down condition of the houses in which they lived, and there was evidence that certain streets in the areas of their residence, notably Hartford Road in the so-called Springville area, and a street known as Texas Avenue, have been neglected and remained unpaved or poorly paved at the time of the trial. It is argued that this failure to supply municipal services is deliberately discriminatory, and that the township has "turned against" the residents of those areas. It is suggested that the court "must make a rigorous and specific order" to "compel" the township to remedy these alleged defects.

In the first place, I find no basis in any of the evidence and testimony for the conclusion that any lack of municipal services is due to a pattern of discrimination on the part of the township. Nor was there any such finding by the court in the first trial. Though Judge Martino did find the existence of some substandard housing, that was simply part of his determination as to the exclusionary nature of the zoning ordinance. No order was made or direction given regarding the upgrading or improving or supplying of municipal services in any area of the township. The Supreme Court likewise did not deal with the problem except as incidental to the obligation of the township to

make reasonably possible housing opportunities for persons of low and moderate income.

The evidence before this court disclosed that, particularly in the areas mentioned, street paving was poor and street lighting was less than adequate. But there was also evidence that these problems were recognized by the township and were receiving attention. Township Engineer Talbot, for example, testified that Hartford Road in the Springville area was due to be improved in the near future. At the risk of going outside the record, I personally observed in a recent drive along Hartford Road that this has indeed been done.

There is simply no evidence in this case from which I can deduce or infer any reason to make such an affirmative order as the plaintiffs suggest. As previously stated, this court may not and will not undertake to dictate to the township how and in what manner its municipal services shall be supplied. *Cf. Visidor Corp. v. Cliffside Park,* 48 *N. J.* 214 (1966) ; *Amelchenko v. Freehold,* 42 *N. J.* 541 (1964).

### Conclusion as to Ordinance 1976–5

The plaintiffs urge the court to adjudge that the "land use controls" of Mount Laurel are invalid and of no effect for failure to comply with the directive of the Supreme Court. They propose that the court enter an order by which the court would in effect assume control of the zoning and land use ordinances of the township and supervise their modification to meet the demands of the plaintiffs. This the court specifically declines to do, not only because it is deemed unnecessary but far more importantly because it is beyond the power and the jurisdiction of this court. Such an order as plaintiffs propose is legislative in character, and the court will not assume legislative prerogatives.

As stated in *Pascack, supra*:

But insofar as review of validity of a zoning ordinance is concerned, the judicial branch is not suited to the role of an *ad hoc* super zoning legislature, particularly in the area of adjusting claims for satis-

faction by individual municipalities of regional needs, whether as to housing or any other important social need affected by zoning. [74 *N. J.* at 487–488]

For all the reasons stated I conclude that Ordinance 1976–5, omitting therefrom the portions which I have held are void and of no effect, constitutes a *bona fide* legislative compliance by Mount Laurel with the directives of the Supreme Court. With the modification indicated it is held valid and is sustained. Except as herein stated, the complaint for declaration of its invalidity is dismissed.

### The Mobile Home Exclusion

There remains to be considered the suit of the intervening plaintiff, Davis Enterprises, seeking that the court declare the Mount Laurel zoning ordinance invalid insofar as it excludes and prohibits altogether the development of mobile home parks, and further seeking affirmative relief by way of a direction that such development be permitted on land of the intervening plaintiff.

In *Vickers v. Gloucester Tp. Comm.*, 37 *N. J.* 232 (1962) the Supreme Court upheld an ordinance providing for the total exclusion of "trailers and trailer camps" from the community. Justice Hall wrote a vigorous dissent. The court, in its opinion, left open the possibility of future reconsideration:

It may be that circumstances will change and trailers and trailer camps will be an appropriate use in some areas of the township. If at that time the provisions of the ordinance become unreasonable they may be set aside. As we said in *Pierro v. Baxendale*, 20 *N. J.* [17] at p. 29 "If and when conditions change, alterations in zoning restrictions and pertinent judicial attitudes need not be long delayed." [at 250]

Despite this reservation, the case has since stood for the principle that municipalities may generally exclude mobile homes. The possibility of reconsideration was mentioned in

*Taxpayers Ass'n of Weymouth v. Weymouth Tp.,* 71 *N. J.* 249, 279, n. 14 (1976) but the court in the circumstances of that case declined to reach the issue.

Mobile homes are defined in the Uniform Construction Code Act as

\* \* \* a vehicular, portable structure which is built on a chassis and designed to be used without a permanent foundation as a dwelling for year round rather than temporary occupancy when connected to required utilities. [*N. J. S. A.* 52 :27D–121]

In the Uniform Construction Code, *N. J. A. C.* 5 :23–1.4, mobile homes are defined thus:

"Mobile home" means a structure transportable in one or more sections which is eight body feet or more in width and is 32 or more body feet in length and which is built on a permanent chassis and designed to be used with or without a permanent foundation when connected to required utilities, and includes the plumbing, heating, air conditioning and electrical systems contained therein.

Mobile homes are distinguished from what the Uniform Construction Code refers to as a "pre-manufactured system," which essentially is a factor-built building, constructed in sections and designed to be transported and assembled elsewhere. It was represented that under the Mount Laurel ordinance pre-manufactured homes, constructed to the standards of the Uniform Construction Code as enacted in New Jersey (*N. J. S. A.* 52 :27D–119 *et seq.*) and set on permanent foundations, are permitted. Mobile homes (at least unless permanently affixed to a foundation) are wholly excluded.

In the light of the vast changes, both social and economic and technological which have taken place since 1962 when *Vickers* was decided, plaintiffs, particularly the intervenor, suggest that the time has come to consider whether the total exclusion of mobile homes from a developing municipality such as Mount Laurel should any longer be considered valid.

Roger Davis, the president and operating head of Davis Enterprises, the intervenor, testified at length to his con-

tinuing (and, to date, vain) efforts to secure authorization to develop and construct a mobile home community in Mount Laurel Township. A builder and developer of long experience, he observed as early as 1974 that rapidly escalating building costs were already making it virtually impossible for private industry to build conventional single-family houses of any size which could be marketed at a price within a range that would make them available to families of low or moderate income. Indeed, he observed that costs even of multi-family housing were escalating beyond the reach of such persons.

Recognizing the acute shortage of decent housing for persons of modest means which thus was engendered, he sought alternate means of contributing to the satisfaction of that need, and concluded that mobile homes offered a viable alternative to conventional permanent housing which might be offered at reasonable cost. He acquired a tract of land 107 acres in extent situate at the intersection of Elbo Lane and the Moorestown-Mount Laurel Road — a tract highly suitable both geographically and topographically for such development. The tract is presently located in a zone classified R–3. Davis set about seeking municipal approval of change in the zoning ordinance and other restrictive regulations which would permit the development of a mobile home community. His efforts have been to date wholly unsuccessful. Indeed, it is clear that the governing body has totally ignored his proposals, declining to give him even a hearing, although he was prepared to make a detailed presentation, with maps, structural data, aerial photographs and slides. Being thus rebuffed, he sought and was granted leave to intervene in this action.

Detailed and graphic evidence was offered on behalf of the Intervenor by Davis himself and by Hans Barnhard Haeckel, an expert in housing planning and development with special knowledge of mobile homes. From that evidence it was made abundantly clear that, in the words of Justice Pashman concurring in *Mt. Laurel*

Mobile homes offer an alternate, less expensive form of housing. They have long since ceased to be mere "house trailers" and have become an important form of mass-produced semi-permanent housing. Indeed for many persons they may be the only form of new housing available. [67 *N. J.* at 202]

Mobile homes are structurally sound, attractive in appearance, and are built and put in place under health and safety standards which are embodied in chapter IX, New Jersey State Sanitary Code. They can be purchased for a price of approximately $12,000 (more for more elaborate units) or rented for about $80 a month — which makes them economically available for persons of low and moderate income. Clearly, compared with the spiralling costs of conventional housing, they are prototypical examples of "least-cost" housing. *Cf. Oakwood at Madison v. Madison Tp.*, 72 *N. J.* 481 (1977).

Although mobile homes may be purchased and placed on individually-owned tracts of land (assuming this to be permitted by municipal regulation, as in Mount Laurel it is not) the conventional mode of their deployment is in mobile home parks or communities, such as the one envisioned and proposed by Davis. Such parks are developed with prepared foundations or pads for the mobile home itself, equipped to enable connection with water, sewer and electrical facilities. Individual mobile homes, owned or rented by their occupants, are placed on these foundations, which are rented by their occupants for a moderate monthly rental. The mobile home park here proposed is designed for the inclusion of these necessary facilities as well as streets and some community recreation and meeting facilities, and with provision for sufficient space to enable them to be attractively landscaped. Davis testified that, in the absence of present restrictive and cost-generating land use controls, multi-family and even single-family units could even now be built so as to be available to the moderate-income range which, as he put it, "I like to hit." But he opined that the mobile home park is the least expensive form of housing to be built. A

comparatively low cost form of mass-produced housing is the so-called "modular" or pre-manufactured unit. These can be built for comparatively low cost compared to conventional housing, but are more expensive than mobile homes.

Davis further testified that subsidy assistance can be made available for the acquisition of mobile homes. He has made a commitment to the Department of Housing and Urban Development (HUD) to make 20% of the proposed park available for subsidized housing under present Federal subsidy programs.

The witnesses for the intervenor described the evolution of the mobile home from what, in municipal ordinances such as those of Gloucester Township and Mount Laurel, are disparagingly referred to as "trailers." The term bespoke the popular concept of itinerancy and instability which was associated with early mobile homes. They were, in fact, trailers, designed to be drawn by passenger automobiles and to move frequently from place to place. They had the appearance of vehicles rather than residences. Early "trailer camps" were little more than parking lots with a few minimal conveniences for those who used them.

The testimony and evidence offered by the intervenor make it abundantly clear that the modern mobile home is a far cry from the primitive highway-borne shelters of the past. It is not necessary to recite the details of that evolution. The conclusion is inescapable that mobile homes are today an acceptable form of housing and are available at cost considerably below that of the most modestly priced conventional single-family dwelling.

The rationale of the *Vickers* decision was, it would appear, the court's acceptance of the factual determination that "trailers" and "trailer parks" were fraught with manifold problems "because of their peculiar nature and relation to the public health, safety, morals and general welfare" and that "these problems persist wherever such camps are located." *Vickers, supra,* 37 *N. J.* at 246. The court therefore concluded that it was within the proper exercise of

the zoning power to exclude them, even from what would be styled today a developing municipality.

### Conclusion as to the Mobile Homes Exclusion.

In view of the development of the attractive, well-constructed mobile home designed and intended for permanent year-round dwelling and capable of being set in attractive surroundings in harmony with conventional residential development, it appears that such a conclusion is no longer supported by the facts. Indeed the court, as previously stated, recognized that changed circumstances might well alter its conclusions.

Here, the court has recognized and pronounced the duty of Mount Laurel, as a developing municipality, to make reasonably possible an appropriate variety and choice of housing for all categories of people who may desire to live there, including those of low or moderate income. From the evidence and testimony in this case I am satisfied that not only are mobile homes an acceptable form of moderate-cost housing, but as their development is proposed by the intervenor, they constitute the only prompt and realistic relief that can be given to plaintiffs to make available an actual supply of least-cost housing in the near future. Indeed, the township does not argue seriously to the contrary.

The change in circumstances foreseen by the court in *Vickers* is upon us. Under these changed circumstances it must be concluded that the continued total exclusion of mobile homes from this developing community is arbitrary, capricious and unreasonable and the provisions of the zoning ordinance ordaining such total exclusion must be declared null and void.

The appropriate Mount Laurel agencies and authorities shall forthwith review the application of Davis for development of a mobile home park and such review shall be in a manner consistent with the least-cost housing principles enunciated in *Oakwood at Madison*. The mobile home park

shall presumptively be deemed to conform to such least-cost principles and adequately to protect the public health, safety and welfare if such plans conform to Chapter IX, New Jersey State Sanitary Code applicable to mobile home parks and the minimum property standards for mobile home parks published by the Department of Housing and Urban Development. In the event the reviewing authorities determine that it is necessary to impose additional conditions upon any approval to be granted by them, such conditions shall be supported by written reasons for imposing such conditions, including an estimate of the additional cost generated by such conditions, and the basis for the estimate.

Review of plans submitted by Davis shall be completed by the reviewing authorities within 90 days.